# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3578

_____

Leo England,                                    *
                                                *
        Appellant,                             *
                                                *    Appeal from the United States
    v.                                       *    District Court for the
                                                *    Eastern District of Arkansas.
Michael J. Astrue, Commissioner                 *
of Social Security,                             *
                                                *
        Appellee.                              *

_____

Submitted:  April 13, 2007
Filed:  July 26, 2007

_____

Before WOLLMAN, BEAM, and COLLOTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Leo England appeals from the district court's[1] order affirming the final decision of the Commissioner of Social Security (Commissioner) that denied England's application for benefits. We affirm.

_____

[1]The Honorable Henry L. Jones, United States Magistrate Judge for the Eastern District of Arkansas, to whom the case was assigned by consent of the parties pursuant to 28 U.S.C. § 636(c).

I.

England, who is now twenty-two years old, was born with hydrocephalus, a condition marked by cerebrospinal fluid within the skull. He received childhood social security disability benefits from 1989 to 1997, when his case was reviewed pursuant to the Personal Responsibility and Work Opportunity Reconciliation Act of 1996. Pub. L. No. 104-193, 110 Stat. 2105 (1996). After this review, the Social Security Administration determined that England was not disabled and was ineligible for benefits effective May 1, 1997. An administrative appeal, as well as a new application for benefits, followed.[2]

A hearing on England's claims was held in May 2004. Because England had turned eighteen by the time of the hearing, the Administrative Law Judge (ALJ) considered both whether England should have received child disability benefits and whether England was eligible for adult disability benefits. The evidence England submitted included reports from his school and evaluations conducted by a consultative psychologist, Dr. Stephen Harris. The ALJ heard testimony from England, his mother, and a medical expert, Dr. Paul Deyoub, who had reviewed England's records. The ALJ determined that England was ineligible for child disability benefits because his impairments did not meet, medically equal, or functionally equal any impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ also determined that England was not eligible for adult disability benefits because he had the capacity to work in jobs that exist in significant numbers in the local, regional, and/or national economies.

---

[2]We omit a full recitation of this case's procedural history as it is not germane to this appeal.

II.

A. Child Disability Benefits

England argues that the ALJ's determination that he was not eligible for child disability benefits was not supported by substantial evidence. We disagree.

"We review *de novo* a district court decision affirming a denial of social security benefits." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citing Strongson v. Barnhart, 361 F.3d 1066, 1069 (8th Cir. 2004)). We will affirm the denial of benefits so long as the Commissioner's decision "conforms to the law and is supported by substantial evidence on the record as a whole." Id. (quoting Collins *ex rel.* Williams v. Barnhart, 335 F.3d 726, 729 (8th Cir. 2003)). "'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'" Stormo v. Barnhart, 377 F.3d 801, 805 (8th Cir. 2004) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)). "We consider both evidence that detracts from and evidence that supports the Commissioner's decision." Id. (citing Prosch, 201 F.3d at 1012). If substantial evidence supports the decision, we will not reverse, even if substantial evidence could have been marshaled in support of a different outcome. Id. (citation omitted).

In determining whether a claimant under the age of eighteen is disabled, the ALJ undertakes a sequential three-step evaluation. 20 C.F. R. § 416.924(a). The first step is to inquire whether the claimant is engaged in substantial gainful activity. Id. The second step is to ascertain whether the impairment or combination of impairments is severe. Id. The third step is to determine whether the claimant has an impairment or impairments that "meet[], medically equal[], or functionally equal[]" a listed impairment. Id. A claimant will not be considered disabled unless he meets the requirements for each of these three steps. Id.

The ALJ determined that because England was not engaged in gainful activity and had severe impairments, he satisfied the requirements of the first two steps. The ALJ rejected England's contention that his impairments were functionally equivalent to a listed impairment, however, and thus determined that England did not meet the requirements of the third step. An impairment is functionally equivalent to a listing when the impairment results in an "extreme" limitation in one domain of functioning or a "marked" limitation in two domains of functioning. 20 C.F.R. § 416.926a(a). There are five domains of functioning, see § 416.926a(b)(1) (listing the domains), but the only domains relevant here are the domains of "interacting and relating with others," "acquiring and using information," and "attending and completing tasks." A marked limitation in a domain is a limitation that seriously interferes with a child's ability to "independently initiate, sustain, or complete activities." § 416.926a(e)(2)(i). A marked limitation is "more than moderate" but "less than extreme." Id. "[I]t is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." Id. Test scores will be considered along with other evidence. § 416.926a(e)(4).

The ALJ determined that England had a marked limitation in interacting and relating with others, but that he did not have marked limitations in any additional domains. Accordingly, the ALJ concluded that England did not meet the requirements for functional equivalency under the third step. England contends that the ALJ's determination is unsupported by substantial evidence.

1.    Acquiring and Using Information

The domain of acquiring and using information pertains to how well a child acquires, learns, and uses information. § 416.926a(g). In concluding that England did not suffer from a marked limitation in this domain, the ALJ noted that in 2001, "school personnel reported that while [England's] overall intellectual ability was in the borderline range, his general fund of knowledge and long term verbal memory

-4-

skills were in the average range with total language skills and oral expression also reported in the average range and with listening skills in the low average range." The ALJ also observed that England had successfully progressed through school and had never been held back in any grade. In addition, the ALJ's decision took note of England's 2000 and 2001 evaluations by Dr. Harris. During the 2001 evaluation, England achieved a verbal IQ score of 77, a performance IQ score of 77, and a full scale IQ score of 75. In 2000, England achieved a verbal IQ of 65, a performance IQ of 82, and a full scale IQ of 71. Moreover, in 2001, Dr. Harris completed a "Medical Source Statement of Ability to Do Work-Related Activities," in which he reported that England had only moderate (as opposed to marked or extreme) limitations in such work-related activities as carrying out detailed instructions and making judgments on simple work-related decisions.[3]

England argues that his IQ scores and other evidence indicate that he suffers from borderline to mild mental retardation, which compels the conclusion that he suffers from a marked limitation. England points out that Dr. Harris had determined in 2001 that England's adaptive functioning appeared to fall within the mildly retarded range. He also notes that – with the exception of his 2000 verbal IQ score of 65, which indicates mild retardation – his IQ scores indicate borderline mental retardation.[4] There was other evidence of low intellectual functioning. During Dr.

---

[3]This assessment may bear on the attending and completing tasks domain as well.

[4]England remarks that his 2000 verbal IQ score of 65, coupled with his other limitations, suffice to qualify him as disabled. Cf. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.05D (retardation may be found, *inter alia*, if the claimant has a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function"). In other words, England appears to imply that his impairments meet or medically equal a listed impairment: mental retardation under § 112.05D. England's references to § 112.05D, however, occur only in the context of his argument about functional equivalency. Accordingly, we confine our review to his functional equivalency argument.

Harris's 2001 examination, he observed that England could not perform simple arithmetic without errors, could not interpret proverbs, and had difficulty following normal conversation. An examination in 1999 showed that England could not spell his name backwards or perform simple calculations. In 1997, when England was in seventh grade, his resource teacher stated that he was reading at a second grade level and that his math was at a fourth grade level. England also argues that although he had never been kept back in school, he was placed in special education classes in several subjects.

Despite this evidence of low intellectual functioning, we conclude that the ALJ's assessment is supported by substantial evidence. First, England's 2001 IQ scores and two of his three 2000 scores are less than two standard deviations below the mean (two standard deviations below the mean would be 70).[5] While these numbers are not necessarily dispositive, see § 416.926a(e)(4)(ii) (noting that the disability determination will not be restricted to test scores alone), they constitute meaningful support for the ALJ's determination.

Second, although Dr. Harris characterized England's adaptive functioning as falling within the mildly retarded range, he also described England's "overall level of intellectual functioning" as borderline and remarked that England's limitations in carrying out work-related activities were only moderate, rather than marked. The ALJ's task was to interpret the significance and import of Dr. Harris's assessments and to resolve any pertinent tensions or contradictions. In so doing, the ALJ properly relied upon Dr. Deyoub, a medical expert, for assistance. See Hudson *ex rel.* Jones v. Barnhart, 345 F.3d 661, 666 (8th Cir. 2003) (noting that the role of the medical expert is to "aid the ALJ in evaluating the medical evidence").

---

[5]The IQ tests administered in this case, the Wechsler Intelligence Scale for Children, has a testing mean of 100 and a standard deviation of 15. See § 112.00D(9) ("The IQ scores in listing 112.05 reflect values from tests of general intelligence that have a mean of 100 and a standard deviation of 15, e.g., the Wechsler series.").

Third, the record contains school assessments that place England in the borderline range of overall intellectual functioning, and in an average to low-average range with respect to more specific intellectual functions. Finally, the fact that England evidently progressed through school while taking at least some general education classes constitutes some support for the ALJ's conclusion. In sum, we conclude that the ALJ's determination that England lacks a marked impairment in the domain of acquiring and using information is supported by substantial evidence.

2.     Attending and Completing Tasks

When considering the attending and completing tasks domain, the inquiry focuses on how well the child is able to focus and maintain his or her attention and how well the child begins, carries through, and finishes activities. § 416.926a(h). One must also determine the pace at which the child performs activities and the ease with which he changes them. Id. The ALJ determined that England had "some degree of limitation" in attending and completing tasks, but did not have a marked limitation in this area. In reaching this conclusion, the ALJ reiterated that England had not repeated any grades at school and noted that Dr. Harris had reported in 2001 that England had only "some difficulty" in staying on track during his interview.[6] The government contends that the ALJ's conclusion is also supported by Dr. Deyoub's assessment that England did not suffer a marked limitation in this domain.

England argues that the ALJ's determination is unsupported by substantial evidence because the ALJ had ignored evaluations from England's teachers, who reported that England's limitations in "concentration, persistence, and pace" are a "serious detriment to [England's] school success." We disagree with England's

---

[6]Dr. Harris remarked in 2001, that "at times [England] does show some difficulties in staying on track." Dr. Harris noted in 2000, that England "does have some difficulty in keeping on track but seems to attempt to work in this area quite a bit."

contention. Although the ALJ did not discuss these reports, "an ALJ's failure to cite specific evidence does not indicate that it was not considered." Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000). Nor are we persuaded that the ALJ was obliged to credit the assessments by England's teachers over the opinions of Dr. Harris and Dr. Deyoub.

England also argues that a marked limitation is indicated by Dr. Harris's 2001 assessment that England is "markedly limited" in his ability to respond "appropriately to work pressures in a usual work setting" and to "changes in a routine work setting." While these limitations may be relevant to England's ability to attend and complete tasks, they do not necessarily comprise the entirety of this domain. The ALJ could have reasonably concluded that, if they did, neither Dr. Harris nor Dr. Deyoub would have arrived at their respective determinations. In sum, although a contrary conclusion may have been justifiable on this evidence, we cannot say that the ALJ's determination was unsupported by substantial evidence.

3.    Dr. Deyoub's Testimony

England contends that the ALJ should not have relied upon Dr. Deyoub's testimony regarding the two contested domains of functioning, which, England contends, was inconsistent with the Global Assessment of Functioning (GAF) score of 50 that two examining psychologists assigned to England.[7] We can discern no material inconsistency between Dr. Deyoub's testimony and England's GAF score. Dr. Deyoub explained to the ALJ that the GAF score, which reflected a global assessment of England's psychological, social, and intellectual functioning, was not

_____

[7]It bears mention that the record reflects that evaluators have, at different times, assigned to England various GAF scores, ranging from the 30s to the 70s.

a particularly illuminating measure of England's functioning in specific domains.[8] Dr. Deyoub's testimony was thus not inconsistent with the GAF score, but merely pointed out its limited utility in this case. Although Dr. Deyoub also suggested that a GAF score of 50 "would probably be more serious" than the limitations he had assessed, his testimony was focused primarily on the score's relevance and not toward whether he might have arrived at a different number.

### B. Adult Disability Benefits

England also contests the ALJ's determination that England is ineligible for adult disability benefits, arguing that the hypothetical posed to the ALJ did not adequately reflect all of England's limitations and that the ALJ did not adequately explain why he rejected England's subjective complaints.

### 1. The Hypothetical

The ALJ asked the vocational expert (VE) to assume

an individual eighteen years of age with an 11th grade education and no past relevant work. Assume no significant exertional limitations and further assume that the individual is limited to work where there is no more than routine interpersonal contact with others. Tasks are learned

---

[8]As England observes, we have considered GAF scores to be relevant evidence in other cases. See, e.g., Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) (noting that a GAF score of 50 "reflects serious limitations in the patient's general ability to perform basic tasks of daily life"). Whatever relevance and significance GAF scores may have in other cases, we cannot say that the ALJ erred in relying upon Dr. Deyoub's assessment of the GAF score in this case. Cf. Hudson *ex rel.* v. Barnhart, 345 F.3d 661, 666 (8th Cir. 2003) (ALJ could rely on medical expert's testimony that claimant's limitations were not as significant as the claimant's GAF scores indicated).

by rote and little judgment is required. Further assume the individual would require simple, direct and concrete supervision.

The VE testified that given those limitations, England could perform housekeeping, janitorial, kitchen, or landscape work. England's attorney then posed an alternate hypothetical in which he asked the VE to assume limitations on understanding and remembering simple and detailed instructions, interacting with coworkers and supervisors, and responding work-related changes and pressures. The VE testified in response that England could still perform jobs that exist in the economy.

England contends that the ALJ's hypothetical should have included an express reference to England's borderline intellectual functioning, arguing that England's need for direct supervision, only routine interpersonal contact, and tasks requiring only simple judgment could be the result of any number of conditions, such as depression or lack of initiative. This argument is unavailing. The hypothetical need not "frame the claimant's impairments in the specific diagnostic terms used in the medical reports, but instead should capture the 'concrete consequences' of those impairments." Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006) (quoting Roe v. Chater, 92 F.3d 672, 676-77 (8th Cir. 1996)). We agree, however, that the hypothetical could have more clearly conveyed the limitations on executing simple and detailed instructions assessed by both Dr. Deyoub and Dr. Harris. Even if the hypothetical fell short in this regard, however, England's attorney posed to the VE a hypothetical that reflected these limitations, in response to which the VE testified that there would still be jobs that England could undertake. Any inadequacy in the hypothetical was thus harmless.

England argues next that the ALJ's hypothetical understated his limitations in interacting with others and that the ALJ neglected to incorporate Dr. Harris's assessment that England was "markedly limited" in his ability to respond

"appropriately to work pressures in a usual work setting" and to "changes in a routine work setting." Although the hypothetical does appear to have understated these limitations, this infirmity was harmless because the VE testified that even with the additional limitations in social interaction proposed by England's attorney, which included those specifically assessed by Dr. Harris, England could perform jobs available in the economy.

2.      Credibility Determination

The ALJ credited the testimony of England and his mother only insofar as this testimony was supported by other substantial evidence.[9] The ALJ also remarked that he believed that England's mother's testimony was motivated by her desire to see her son receive benefits. England argues that the ALJ should have given specific reasons why he discredited the their testimony. Having reviewed the record, we conclude that the ALJ offered sufficient explanation for not accepting the England' testimony in its entirety.

The judgment is affirmed.

_____

---

[9]We note that it is not clear from the record what specific testimony the ALJ chose not to credit. Nor has England specified the testimony at issue or suggested how the ALJ's credibility determination might have borne on the outcome of his claim.