**Randy J. NEWCOMB, Plaintiff,**

v.

**Carolyn W. COLVIN, Commissioner of Social Security, Defendant.**

No. C12–4051–LTS.

United States District Court,
N.D. Iowa,
Western Division.

March 6, 2013.

David A. Scott, Cornwall Avery Bjornstad Scott, Spencer, IA, for Plaintiff.

Matthew J. Cole, U.S. Attorney's Office, Cedar Rapids, IA, for Defendant.

## ORDER

LEONARD T. STRAND, United States Magistrate Judge.

### Introduction

Plaintiff Randy Newcomb seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3). Newcomb contends the administrative record ("AR") does not contain substantial evidence to support the Commissioner's decision that he is not disabled. For the reasons that follow, I affirm the Commissioner's decision.

### Background

Newcomb was born in 1967, has an eighth grade education and a GED. AR 28, 111. He previously worked as a cook, electrician helper, tire retreader and welder. AR 244. Newcomb protectively filed for benefits on January 12, 2009, alleging disability beginning on October 31, 2006, due to his mental condition. AR 111–20, 156. His claims were denied initially and on reconsideration. AR 48–51. Newcomb requested a hearing before an Administrative Law Judge ("ALJ"). AR 64–65. On December 3, 2010, ALJ Robert Maxwell held a hearing during which Newcomb and a vocational expert ("VE") testified. AR 24–47.

On February 14, 2011, the ALJ issued a decision finding Newcomb not disabled since October 31, 2006. AR 10–18. Newcomb sought review of this decision by the Appeals Council, which denied review on March 19, 2012. AR 1–3. The ALJ's decision thus became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

On May 17, 2012, Newcomb filed a complaint in this court seeking review of the ALJ's decision. On June 11, 2012, with the parties' consent, United States District Judge Mark W. Bennett transferred the case to me. Doc. No. 5. The parties have briefed the issues and the matter is now fully submitted.

### Summary of Evidence

I have reviewed the entire administrative record and provide the following summary of the evidence relevant to Newcomb's claim:

#### A. Medical Evidence

There is no medical evidence in the record dating back to Newcomb's alleged onset date of October 31, 2006.[1] A mental health screen was performed on December 12, 2007, by the Minnesota Department of Corrections.[2] AR 246. This evaluation indicated Newcomb had no critical mental problems, although Newcomb suggested that he may have attention deficit hyperactivity disorder ("ADHD"). *Id.*

The record contains progress notes from Avera Spencer Family Clinic dating from March 19, 2009, to April 7, 2009. AR 254–57. On March 19, Newcomb reported problems with concentration. AR 256.

---

1. A disability report from January 12, 2009, suggests Newcomb's alleged onset date was based on his last date of performing substantial gainful activity ("SGA"). The interviewer noted that since October 31, 2006, Newcomb had worked at a job below the SGA level. Newcomb worked as a tire retreader starting in August 2007, but left that job because he went to prison. AR 145, 152, 218.

2. Newcomb was incarcerated for 16 months for DWI. AR 37. He was released in early 2009.

He stated he was an alcoholic, but had been without alcohol for two years. *Id.* Newcomb explained he was unemployed and could not get employment because he could not "settle down quietly enough to fill out an application for a job." *Id.*

The provider noted Newcomb's appearance was "somewhat ill-kept" and his speech was rushed. During the appointment, Newcomb was playing with rubber bands and stretching paper. AR 257. His hands were constantly active and his legs were moving too. *Id.* Newcomb was given a sample of Seroquel and an appointment was scheduled for him at Seasons Center for Mental Health ("Seasons Center"). At a follow-up on March 26, 2009, Newcomb complained of side effects from the Seroquel and was given a low dosage of Adderall XR. AR 255. On April 7, he reported the medication had significantly helped him and he had good concentration. AR 254.

Newcomb's treatment records from Seasons Center date from April 8, 2009, to October 25, 2010. AR 282–87. During his first appointment, Newcomb complained he could not concentrate and was "off the walls." AR 285. In explaining his past work as an electrician, Newcomb stated he was always very productive, but was unable to finish tasks. *Id.* He said he had always been hyper and had a hard time in school because he was unable to sit still and concentrate. *Id.* Newcomb explained he did not go to AA meetings because he could not sit still longer than 20 minutes.

He also could not watch television for more than 20 minutes. *Id.* He said that in the past he had used alcohol to self-medicate and "slow his mind down." AR 286. The physician assistant gave him a Global Assessment of Functioning ("GAF") score of 55.[3] She diagnosed him with ADHD and prescribed Adderall. AR 287.

At follow-up appointments in April, May and June of 2009, Newcomb reported he was doing well on Adderall. AR 282–84. He was able to concentrate and do tasks around the house. AR 284. He also had been working with an uncle on a farm and was looking into applying for a full time job. AR 283. In June, he reported doing a lot of part-time work and was going to spend the next two weeks painting a house. He stated he had been more active and everything was fine. AR 282. He was assessed GAF scores of 65 and 70.[4]

On July 31, 2009, Newcomb reported he was taking Adderall four times daily instead of three times as prescribed. AR 294. Christine Segreto, D.O., increased his prescription to four times daily. *Id.* In February 2010, Dr. Segreto noted that Newcomb might have a borderline IQ and wrote, "I can see why he'd have a lot of difficulty following directions and keeping a job." AR 291. She assessed a GAF score of 52.

On May 19, 2010, the Minnesota Department of Corrections performed a mental health screening.[5] AR 297–300. Newcomb said he had difficulty sustaining at-

---

**3.** A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.) (DSM–IV). A GAF score of 51–60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

**4.** A GAF score of 61–70 indicates some mild symptoms or some difficulty in social occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. DSM–IV at 34.

**5.** Newcomb was incarcerated for four months on a release violation. AR 38, 298, 301.

tention and organizing tasks and activities, he occasionally would avoid tasks that required sustained mental effort, he was easily distracted and fidgety, felt restless, had difficulty engaging in quiet leisure activities, felt like he was "on the go," would talk excessively, blurted out answers before questions had been completed, had difficulty waiting his turn and would interrupt others. AR 298. The counselor noted many of these symptoms were evident during the meeting. His GAF score was 45.[6] She assessed a provisional diagnosis of ADHD. AR 299.

Newcomb was taken off his Adderall medication while in prison. AR 328. A nurse practitioner noticed that a few hours after taking Adderall, Newcomb was extremely anxious and hyper. AR 318. He was prescribed clonidine, but insisted that Adderall was most effective in controlling his symptoms. AR 316, 319. In June, his clonidine prescription was increased and lithium[7] was added. AR 316. Newcomb complained about this medication. AR 313. He said he was feeling depressed, worrying about everything, and could not sleep. When he met with the counselor, he demanded to be put back on Adderall. Id. She noted he was angry, demanding and antagonistic during this meeting. AR 314. His speech was loud, rapid and pressured and he initially spoke in fragmented statements, not finishing one thought before moving on to the next. Id. The counselor told Newcomb she could not make changes to his medication and Newcomb

stated he did not want additional services from the counselor at that time. Id. In July, Tegretol[8] and Desipramine[9] were added to Newcomb's medications. AR 304. Newcomb stopped taking Desipramine after a week and a half because it made him more depressed and tearful. Id. Tegretol helped him to sit down in the evening and sleep better with no side effects. Id.

Newcomb was released on September 10, 2010. AR 301–02. Brad Dupre, M.D., who had prescribed Newcomb's medications, advised Newcomb that that he was far less anxious on this medication than he was when he first arrived on his Adderall medication. Id. Newcomb denied that he was anxious and restless on Adderall. Dr. Dupre wrote, "[H]e is not at all interested in hearing how stimulants for him are probably not the best choice. Mood stabilizers and non-addicting ADHD medications are clearly the best choice." Id.

In October 2010, Newcomb returned to Seasons Center. He appeared disheveled and hyperactive. AR 290. Dr. Segreto noticed a tremor in his legs and hands and thought that it might be caused by a neurological disorder. Id. She noted he was hyperverbal and hyperkinetic. Id. Newcomb said he had taken Adderall that morning. He told her he had been in prison for the past 169 days, but did not inform her of the medications he was taking there. Id. Newcomb also mentioned he had been diagnosed with bipolar disor-

---

6. A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM–IV at 34.

7. Lithium is commonly used to treat mania and bipolar depression. The Gale Encyclopedia of Mental Health 896 (Kristen Key ed., 3d ed. 2012).

8. Tegretol is a trade name for carbamazepine. Carbamazepine is effective in combination

with other drugs, for psychiatric disorders such as mania and extreme aggression. The Gale Encyclopedia of Mental Health 279 (Kristen Key ed., 3d ed. 2012).

9. Desipramine is an antidepressant drug used to elevate mood and promote recovery of a normal range of emotions in patients with depressive disorders. It also has therapeutic uses for ADHD. The Gale Encyclopedia of Mental Health 458 (Kristen Key ed., 3d ed. 2012).

der in the past. While he had not been diagnosed by anyone at Seasons Center with that disorder, she thought it made sense. *Id.* She wrote, "He has applied for disability and I have to honestly say I can't imagine him being able to hold down a job in the competitive job market." *Id.* She refilled his Adderall prescription and noted that she planned to refer him to a neurologist for his tremor. *Id.*

## B. Consultative Examination

William E. Morton, Psy.D., performed a consultative examination on March 25, 2009. AR 25–53. Newcomb stated that he had been sober from alcohol for two years, that he had not worked since 2006 and the longest job he held was for one year. *Id.*

As for his daily activities, Dr. Morton noted that Newcomb was living with his mother. *Id.* He did not drive and got very little exercise. *Id.* He slept approximately 13 hours each day. Newcomb required no assistance taking medications. *Id.* He was able to participate in straightening up the home, outside work, laundry, and personal grooming without assistance. AR 251. However, Dr. Morton noted that Newcomb was not able to adequately manage his own finances. *Id.*

Depression screening was positive and Newcomb reported the following symptoms: sleep disturbance, irritability, loss of concentration, loss of motivation, little or no energy, fatigue, subjective feelings of sadness, anhedonia, social isolation, feelings of worthlessness, and feelings of hopelessness. *Id.* Mania screening revealed expansive, elevated or irritable mood; flight of ideas or subjective experience of racing thoughts; pressured speech; psychomotor agitation; excessive involvement in activities with a potential for negative consequences; and distractibility. *Id.* Anxiety and psychosis screenings were negative. *Id.*

Dr. Morton administered the Wechsler Adult Intelligence Scale–Fourth Edition and found that Newcomb was functioning in the borderline intellectual range of cognitive abilities. AR 252. In his summary, Dr. Morton wrote:

> It appears that there are mild mental limitations in regard to remembering and understanding instructions, procedures, and locations. There are mild mental limitations in regard to carrying out instructions. There are minimal mental limitations in regard to maintaining attention, concentration, and pace. There are moderate mental limitations in regard to interacting appropriately with supervisors, co-workers, and the public. There are mild mental limitations in regard to using good judgment and responding appropriately to changes in the work place.

AR 252–53.

## C. State Agency Medical Consultant

Aaron Quinn, Ph.D., performed a RFC assessment and psychiatric review technique on April 9, 2009. AR 264–81. In his RFC assessment, Dr. Quinn found Newcomb had moderate limitations in his ability to: understand and remember instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, get along with coworkers or peers without distracting them or exhibiting behavioral extremes and respond appropriately to changes in the work setting. AR 278–79. In all other areas, Newcomb was not significantly limited. *Id.* In his psychiatric review technique, Dr. Quinn found Newcomb had moderate difficulties in maintaining social

functioning and maintaining concentration, persistence or pace. AR 274. He had mild restriction in activities of daily living and no episodes of decompensation. *Id.*

Dr. Quinn summarized that Newcomb had medically determinable impairments of borderline intellectual functioning and bipolar one disorder, moderate. AR 280. Dr. Quinn found that Newcomb's function report was generally consistent with the medical evidence and he found Newcomb's allegations to be credible. He noted that Newcomb's impairments did not meet or equal listing level severity. *Id.* Dr. Quinn concluded that Newcomb could be expected to have work-related difficulties with extended attention, detailed instructions, stress management, interpersonal functioning, and change. He also stated Newcomb retained the ability to complete simple repetitive tasks on a sustained basis if he was able to work independent of others. AR 280–81.

John Tedesco, Ph.D., reviewed the file for reconsideration after Newcomb reported he had been diagnosed and treated for ADHD since April 8, 2009, and had new limitations associated with his mental impairments. AR 288. Newcomb alleged that he was not able to focus on simple tasks and would get frustrated. *Id.* He reported that he was unable to do a job asked of him because of these difficulties and his employment was terminated as a result. *Id.*

Dr. Tedesco reviewed new medical evidence, which included treatment records from Seasons Center. The most-recent record, dated June 3, 2009, indicated Newcomb's medication was working well with no significant side effects. *Id.* Newcomb reported he had been able to work and function normally throughout the day and was not having problems with concentration. His mental status was within normal limits. Dr. Tedesco affirmed Dr. Quinn's report as written. *Id.* He noted the ADHD diagnosis was "new", but said it had been considered historically, was long term in nature and had likely been present in the past. *Id.*

### D. Hearing Testimony

Newcomb testified that he was 43 years old and living in Spencer, Iowa, with his mother. AR 28. He completed eighth grade and obtained his GED a few years before the hearing. *Id.* He served in the army from 1985 to 1986 and received a general honorable discharge. *Id.*

Newcomb was most-recently employed as an electrician's helper for Hi–Tech Electric in 2005. AR 29–30. The ALJ asked Newcomb about references to more recent part-time work in the record. *Id.* Newcomb testified this work had been done for relatives for a couple hours at a time to keep him busy and he did not receive any payment for it. *Id.* Newcomb worked with Hi–Tech Electric on a new Walgreens store in Spencer, Iowa, for three to four weeks. AR 30. After Hi–Tech Electric, he received unemployment benefits for about eight months and then could not find other work. AR 41. Before Hi–Tech Electric he worked for another company doing electrical work and also worked at a processing plant doing maintenance work. AR 32.

Newcomb testified that he was currently taking Adderall three times a day as prescribed, although he had not taken it that morning. AR 33–34. The ALJ noted that Newcomb was constantly fidgeting in his chair, moving back and forth, moving his hands, gesturing constantly, and speaking with a rapid speech rate during the hearing. AR 40. Newcomb said his last appointment with Dr. Segreto was on October 25, 2010. AR 34. He testified Adderall helps him stay focused and slows his movements so he can maintain a task for a longer period of time. AR 40.

As for his history with alcohol abuse, Newcomb testified he was no longer drinking. AR 36. He had a DWI in 2003 and served 16 months in prison. AR 37. Newcomb testified he then sought counseling at Seasons Center. *Id.* He was imprisoned again in 2010 for four or five months for "a sentencing issue." AR 38. Newcomb said the last time he used alcohol was 2005. AR 39.

While in prison, Newcomb said he received mental health treatment and was put on multiple medications. *Id.* He said Dr. Segreto had never prescribed anything but Adderall. AR 40. He did not have any restrictions placed on his activities while in prison. AR 41. He testified that he was not given a job in prison, as the authorities believed it would be harmful to him or others. *Id.* Newcomb said he was unsure why his other jobs ended, stating he had been misunderstood. AR 42.

A VE also testified at the administrative hearing. The ALJ gave the VE the following hypothetical:

> Assume with me . . . you're dealing with an individual of younger age . . . under 50. He has a high school equivalency education. He has a work history as you described as medically determinable non-exertional impairments, causing the same difficulties and making personal, social, and occupational adjustments in a job setting as have been described in the testimony. Accepting his descriptions of his limitations, would you expect the person to be able to do any of the past work of the claimant?

AR 44. The VE ·answer "no", further stating that no other full-time work was available under this hypothetical. The second hypothetical included the same age, education and work experience as before, but the individual would only be able to perform simple, repetitive tasks on a sustained basis and work independent of others. AR 45. The VE stated these limita-tions were not consistent with Newcomb's past work, but were consistent with other unskilled jobs such as polisher in metal and plastic industries and inspector. *Id.* These jobs were available in significant numbers in Iowa and the national economy. *Id.* The VE also testified that if all Newcomb's testimony was found credible, there are no jobs he could perform. AR 46. He specifically identified Newcomb's descriptions of his extremely poor communication skills and behavioral education to support this conclusion. *Id.*

### Summary of ALJ's Decision

The ALJ made the following findings:

(1) The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.

(2) The claimant has not engaged in substantial gainful activity since October 31, 2006, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

(3) The claimant has the following severe impairments: borderline intellectual functioning; attention deficit hyperactivity disorder; and bipolar disorder (20 CFR 404.1520(c) and 416.920(c)).

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant is able to perform short, repetitive tasks on a

sustained basis if able to work independent of others.

(6) The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

(7) The claimant was born on August 18, 1967 and was 39 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

(8) The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(9) Transferability of job skills is not material to the determination of disability because using the Medical–Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82–41 and 20 CFR Part 404, Subpart P, Appendix 2).

(10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

(11) The claimant has not been under a disability, as defined in the Social Security Act, from October 31, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

AR 11–19.

The ALJ found that although Newcomb had severe impairments of borderline intellectual functioning, ADHD and bipolar disorder, these impairments did not meet or equal any of the listed impairments. He then conducted the RFC analysis and found that although Newcomb's medically-determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. AR 14. The ALJ considered all of the evidence in the record and found the following particularly probative:

(1) the claimant's activities of daily living are more consistent with his residual functional capacity than with a finding of complete disability

(2) the claimant's allegations regarding the intensity, persistence, and limiting effects of his impairments are not consistent with the medical evidence of record

(3) the claimant's work history is not consistent with his claim of being disabled.

*Id.* For daily activities, the ALJ noted the evidence showed Newcomb was able to take care of his personal needs and engage in household chores. AR 15. He was also able to get out in the community and interact with others. The ALJ found these activities were consistent with the mental demands of unskilled work. *Id.* As for the intensity, persistence, and limiting effects of his impairments, the ALJ noted that Newcomb's treatment history showed relatively few psychiatric and therapy visits and throughout most of his alleged period of disability, he had taken one medication which has generally been successful in alleviating his symptoms. *Id.*

The ALJ also considered the mental status examinations in the record. AR 16. He noted that these examinations did not disclose signs or symptoms that would correlate to the need for additional limitations in the claimant's RFC. In examining Newcomb's GAF scores he noted that most ranged from 50 or higher and were often in the 60 to 70 range. AR 15. He found that this range was a true representation of Newcomb's level of functioning during his alleged period of disability and indicat-

ed an ability to work within the limitations described in the RFC. AR 16. He acknowledged that Newcomb had received lower scores, such as while in prison, but the ALJ found these did not represent Newcomb's general level of functioning while on Adderall. *Id.* The ALJ gave Dr. Morton's findings significant weight, as they were based on direct examination of Newcomb and were consistent with the record as a whole.

The ALJ found the medical evidence did not support a claim of disability. AR 17. He noted Newcomb's testimony was also inconsistent with the medical evidence and the ALJ questioned whether Newcomb was prone to exaggeration in an attempt to gain benefits. *Id.* He remarked that Newcomb was fidgeting, speaking rapidly, and could not finish his thoughts during the hearing. He stated that this behavior was not reflected in the medical evidence, even when Newcomb was off his medications. *Id.* He also stated that while Newcomb testified he had abstained from alcohol since 2005, the record shows Newcomb admitted to alcohol use in 2007 and 2010.

The ALJ also discredited Newcomb based on his work history. The ALJ noted that usually a solid work history with multiple consecutive years of substantial gainful activity provides probative value of a claimant's disability. Although Newcomb has such a history, the ALJ found that in this case it showed Newcomb's ability to work. AR 17. He reasoned that Newcomb was able to maintain regular employment despite his impairments and, if anything, Newcomb's symptoms have actually improved with medical treatment. *Id.* He also pointed out that the record indicates Newcomb was able to work during his alleged period of disability and his job ended because he went to jail, not because his impairments were too limiting. *Id.* In addition, Newcomb testified that the reason he could not return to work in the electrical field was because he could not get hired without a driver's license. *Id.* The ALJ concluded Newcomb's work history did not bolster his allegations of disability.

The ALJ gave Dr. Segreto's opinion limited weight. *Id.* He found that it covered an issue expressly reserved to the Commissioner and it did not provide specific limitations that were applicable to the medical-vocational analysis. *Id.* In addition, he found it inconsistent with Newcomb's treatment notes. *Id.*

Finally, the ALJ considered the third-party function report submitted by Newcomb's mother. She stated Newcomb had a reduced level of functioning, but generally described activities and abilities that were consistent with unskilled work. *Id.* For this reason, her observations were credited to the extent they were consistent with the RFC, but were given limited weight to the extent they were not, for the same reasons the ALJ discredited Newcomb's own allegations. *Id.*

### *Disability Determinations and the Burden of Proof*

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists … in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir.2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir.2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, coworkers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir.2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir.1998).

■ Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir.2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will

consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358–59 n. 5 (8th Cir.2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir.2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir.2004).

### The Substantial Evidence Standard

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir.2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...").

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir.1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir.2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir.2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir.2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir.1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir.1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir.1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir.1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir.1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent

positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir.1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir.1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir.2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

### Discussion

Newcomb argues there is minimal to no evidence in the record that he is capable of full-time work in a competitive work environment. Newcomb cites portions of medical records to support this argument. He also argues the VE's testimony is flawed because he relied on the state agency medical consultant's opinion that Newcomb's abilities were consistent with unskilled work, which did not include consideration of Newcomb's fidgety behavior during his appointment on October 25, 2010, and at the hearing. I will address these arguments separately below and will also consider whether the ALJ conducted a proper credibility analysis in reaching his RFC determination.

### A. Evaluation of Medical Evidence

Newcomb first relies on Dr. Morton's consultative examination in support of a finding of disability. He points out that Dr. Morton diagnosed him with bipolar disorder and borderline intellectual functioning. He also emphasizes that Dr. Morton stated Newcomb could not manage his own finances and had considerable weaknesses in his verbal abstract thinking, short-term attention abilities and clerical speed and accuracy. The Commissioner argues that the ALJ appropriately gave Dr. Morton's opinion significant weight because it was based on his direct examination and was consistent with the record as a whole.

■ Generally, "the report of a consulting physician who examined the claimant once does not constitute "substantial evidence," especially when contradicted by the evaluation of the claimant's treating physician." *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir.2000). However, "an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." *Prosch v. Apfel*, 201 F.3d 1010, 1014 (8th Cir.2000). The ALJ must consider the following factors in deciding the weight to give any medical opinion:

(1) length of the treatment relationship and the frequency of examination,

(2) nature and extent of the treatment relationship,

(3) supportability,

(4) consistency [with the record as a whole],

(5) specialization,

(6) other factors [which tend to support or contradict the opinion].

20 C.F.R. §§ 404.1527(c), 416.927(c).

■ Here, the ALJ appropriately gave Dr. Morton's opinion significant weight. The only treating physician opinion is from Dr. Segreto, which the ALJ discredited for good reasons that will be discussed below. Dr. Morton's findings are supported by substantial evidence in the record and the ALJ incorporated the limitations Dr. Morton identified into Newcomb's RFC. For

instance, Dr. Morton found that Newcomb had considerable weaknesses in his verbal abstract thinking, short-term attention abilities and clerical speed and accuracy and the ALJ included the limitation of short, repetitive tasks in Newcomb's RFC. Dr. Morton also found that Newcomb had moderate limitations in social interactions and the ALJ included such a limitation in Newcomb's RFC. Dr. Morton's opinion does not support a finding of total disability, and the ALJ accurately included the identified limitations in the RFC determination, which are consistent with and supported by substantial evidence in the record as a whole.

█ Newcomb next relies on Dr. Dupre's psychiatric assessment from September 9, 2010, in which he stated that Adderall was counterproductive in controlling Newcomb's symptoms. The Commissioner argues Dr. Dupre's opinion does not provide support for a disability. His opinion addresses the effectiveness of Adderall compared to other medications that could reduce Newcomb's symptoms. The Commissioner also emphasizes that the standard of review requires me to consider whether substantial evidence supports the ALJ's findings, not whether substantial evidence could support other findings.

First, I find that Dr. Dupre's opinion as to the ineffectiveness of Adderall does not support a finding of disability. Indeed, Dr. Dupre found that Newcomb's symptoms can be controlled by other medications. Second, I agree with the Commissioner that I must determine whether the ALJ's decision is supported by substantial evidence in the record as a whole and not whether the evidence could support a different outcome. *See England v. Astrue*, 490 F.3d 1017, 1019 (8th Cir.2007) ("If substantial evidence supports the decision, we will not reverse, even if substantial evidence could have been marshaled in support of a different outcome.").

The ALJ did not discuss Dr. Dupre's opinion, however, other references to the prison records indicate that the ALJ considered this evidence, but did not give it much weight. For instance, the ALJ noted that Newcomb typically had GAF scores of 50 and above and often in the 60 to 70 range. AR 15. He noted that although there were instances of lower scores (referencing Newcomb's treatment records from prison) these "do not represent his general level of functioning when he is on medication." AR 16. This reasoning is supported by substantial evidence.

From April to June 2009, Newcomb reported that Adderall significantly helped him, he was able to concentrate and help out around the house, was more active, and was doing a lot of part-time work. AR 254, 282–84, 295. The record demonstrates Newcomb only exhibited difficulty with his symptoms before he started taking Adderall at the increased prescribed dosage, the four months he was in prison without Adderall and the month after he was released from prison. AR 285–87, 290, 297–328. Dr. Dupre's opinion that Adderall was ineffective is inconsistent with substantial evidence in the record, including Newcomb's own statements and those of his treating physician that Adderall was effective in controlling his symptoms.

█ Newcomb next relies on Dr. Segreto's opinion from October 25, 2010, to support his argument that he is disabled. Newcomb told her he could not sit still or focus without Adderall. Dr. Segreto noticed he had a tremor of his legs and hands, which she thought could be a neurological disorder. He was also hyperverbal and hyperkinetic at this appointment. AR 290. Newcomb uses this evidence to argue the ALJ erred by stating that the fidgety behavior he displayed at the hearing was absent from the medical evidence.

The ALJ noted in his decision and during the hearing that Newcomb was constantly fidgeting, speaking very rapidly and was unable to finish any train of thought. In his decision he wrote, "A similar severity of symptoms and behavior has never been reflected in the medical evidence of record, even when the claimant has previously been off medications." AR 17. While the ALJ apparently overlooked Dr. Segreto's notes reflecting a similar instance of this behavior, this error does not require remand.

The ALJ found that Adderall was generally successful in alleviating Newcomb's symptoms. AR 15. Newcomb had not taken Adderall before the hearing. AR 33. Newcomb had taken Adderall before his October 25, 2010, appointment but had been off it for four months while in prison and placed on other medication. AR 290. Newcomb exhibited similar behavior on March 19, 2009, when he initially sought treatment for his symptoms. He was playing with rubber bands, stretching paper and was constantly active with his hands and legs. AR 257. The only evidence of similar behavior while taking Adderall is from his time in prison when a nurse observed that he was extremely anxious and agitated a couple hours after taking Adderall. AR 310, 318. For this reason, he was taken off of it. *Id.* However, Newcomb continued to exhibit hyper and anxious behavior on his other medications, and insisted throughout his imprisonment that he needed Adderall. AR 298, 301, 304, 306, 310. The fact that Newcomb was observed in a hyper and anxious state on one occasion in prison after taking Adderall does not detract from the other substantial evidence in the record demonstrating that it was effective in controlling his symptoms.

Substantial evidence indicates that instances of fidgety behavior are associated with a change or lack of medication or may be related to another impairment that has not yet been diagnosed, as Dr. Segreto suggested. In other words, these instances do not reflect Newcomb's behavior when taking his Adderall medication as prescribed. The ALJ made a similar finding in the context of Newcomb's GAF scores. The ALJ's misstatement about the lack of other instances of fidgety behavior in the record has no effect on the analysis because the circumstances of those instances support the ALJ's previous determination that Adderall is effective in controlling Newcomb's symptoms.

The ALJ also was entitled to disregard Dr. Segreto's opinion that she could not "imagine him being able to hold down a job in the competitive job market." AR 290. The ALJ gave her opinion limited weight because it went to an issue expressly reserved to the Commissioner, it did not provide specific limitations that were applicable to a medical-vocational analysis and it was inconsistent with Newcomb's treatment notes during the alleged period of disability. AR 17. These reasons are supported by substantial evidence in the record as a whole.

A "medical opinion" is defined as a statement from a physician or psychologist or other acceptable medical source that reflects judgment about the nature and severity of a claimant's impairment(s), including his or her symptoms, diagnosis and prognosis, what he or she could still do despite the impairment(s) and his or her physical or mental restrictions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). "[S]tatements that a claimant could not be gainfully employed 'are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner].'" *Krogmeier v. Barnhart,* 294 F.3d 1019, 1023 (8th Cir.2002) (quoting *Cruze v. Chater,* 85 F.3d 1320,

1325 (8th Cir.1996)). "A treating physician's opinions must be considered along with the evidence as a whole, and when a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." *Krogmeier*, 294 F.3d at 1023.

Dr. Segreto's opinion that Newcomb cannot hold a job is not a medical opinion and is not consistent with the record as a whole. The ALJ correctly determined it was entitled to no deference because "it invades the province of the Commissioner to make the ultimate disability determination." *House v. Astrue*, 500 F.3d 741, 745 (8th Cir.2007). As the ALJ also noted, Dr. Segreto's opinion contains no specific limitations to indicate a disability, but was only a conclusory statement. *See Ward v. Heckler*, 786 F.2d 844, 846 (8th Cir.1986) (noting that "statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature."). The ALJ's finding that Dr. Segreto's opinion is inconsistent with treatment notes is also supported by substantial evidence in the record. While taking medication as prescribed on a regular basis, Newcomb reported he was able to concentrate, stay on task, work later in the day, and complete projects. AR 254, 282–84. He also performed part-time work during his alleged period of disability. AR 282. The ALJ did not err in giving Dr. Segreto's opinion limited weight.

The ALJ properly evaluated the medical evidence in the record. Although Newcomb argues there is some evidence that could support a finding of disability, substantial evidence supports the ALJ's decision, which is the standard of review I must follow. The evidence referenced by Newcomb, such as the instances of fidgety behavior, correlates to changes or lack of medication. These instances actually support the ALJ's finding that when Newcomb was taking Adderall as prescribed he did not experience those symptoms and was able to function within the RFC determined by the ALJ.

### B. Credibility Determinations

Newcomb does not challenge the ALJ's credibility determinations, but because the ALJ evaluated the credibility of Newcomb's and his mother's subjective allegations to determine Newcomb's RFC, I will consider whether the ALJ's credibility determinations are supported by substantial evidence.

 "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir.2000). In assessing a claimant's credibility, the ALJ must consider "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir.2009) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984)). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir.2008) (quoting *Wheeler v. Apfel*, 224 F.3d 891, 894 (8th Cir.2000)). However, lack of objective medical evidence cannot be the sole reason for discounting a claimant's subjective complaints. *Mouser*, 545 F.3d at 638. An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole. *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir.2008). The ALJ does not need to discuss each

*Polaski* factor as long as he or she "acknowledges and considers the factors before discounting a claimant's subjective complaints." *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir.2009).

■ The ALJ considered Newcomb's activities of daily living, the effectiveness of his medication, functional restrictions and his prior work history in determining whether Newcomb's and his mother's allegations of disability were credible. The ALJ noted that Newcomb was able to take care of his personal needs, contribute to the functioning of the household and get out in the community and interact with others on a regular basis. The ALJ found these activities were consistent with the mental demands of unskilled work. Considering Newcomb's treatment, the ALJ remarked that it consisted of relatively few psychiatric and therapy visits and Newcomb had only been on one medication throughout most of the alleged period of disability. AR 15.

The ALJ also considered Newcomb's functional restrictions as described by Dr. Morton and his mother. Dr. Morton found that Newcomb had mild limitations in remembering, understanding, and carrying out instructions and in maintaining attention, concentration and pace. AR 16. He also found that Newcomb had moderate limitations in interacting appropriately with supervisors, coworkers and the public. *Id.* Newcomb's mother observed that Newcomb had a "reduced level of functioning," but the ALJ noted that the activities and abilities she described were consistent with the ability to perform unskilled work.

Finally, the ALJ considered Newcomb's work history, finding that it demonstrates that Newcomb was able to maintain regular employment despite his untreated impairment while the medical evidence shows Newcomb's symptoms improved with treatment. The ALJ also noted that Newcomb's previous jobs seemed to end for reasons other than his impairment and Newcomb's reasons for why he could not return to his past work had to do with employers' hiring practices and not his impairment.

The ALJ's credibility determination based on these factors is supported by substantial evidence in the record as a whole. The evidence demonstrates that Adderall is effective in controlling Newcomb's symptoms. While taking this medication on a regular basis as prescribed, Newcomb reported he was able to get work done, spent two weeks painting a house, worked with an uncle on a farm and helped his mother with chores, gardening, and fixing the house. AR 282–84.

Prior to being diagnosed and treated with ADHD, Newcomb described difficulties finishing activities and would spend most of his day on the computer or watching television. AR 164–171. However, he also held many jobs before he was diagnosed and treated for ADHD. AR 176–77. While most of these jobs were short in duration, Newcomb's symptoms were untreated at the time. When Dr. Morton performed his consultative examination on March 25, 2009, Newcomb had not yet been treated with Adderall. AR 250–53, 255–57. Nonetheless, the ALJ incorporated the limitations identified by Dr. Morton into the RFC determination. Since he has been treated, Newcomb has stated many times Adderall is effective in controlling his symptoms and that he is able to perform many work-related activities for longer duration. AR 40, 254, 282–84, 309, 310, 313. The ALJ correctly assessed the credibility of Newcomb's and his mother's allegations and accurately incorporated the allegations supported by substantial evidence into the RFC determination.

### C. Hypothetical Question to VE

Finally, Newcomb argues the VE's testimony "provides scant support for the deci-

sion of the ALJ." He points out that the VE found Newcomb would not be able to do any of his past work or any other work if Newcomb's description of his limitations was fully credited. He suggests that the opinions of Dr. Dupre and Dr. Segreto identify more severe limitations than Newcomb himself does. Finally, he argues a hypothetical question based on the state agency medical consultant's assessment was improper because it did not include consideration of the instances of Newcomb's fidgety behavior reflected in Dr. Dupre's and Dr. Segreto's opinions and the ALJ's observations during the hearing.

The Commissioner argues the hypothetical that was based on the state agency medical consultant's assessment included all of Newcomb's credible limitations. Therefore, she contends the VE's testimony in response to that hypothetical constitutes substantial evidence supporting the ALJ's decision that Newcomb is not disabled.

 The ALJ's hypothetical question to the VE must include those impairments that the ALJ finds are substantially supported by the record as a whole. *Buckner v. Astrue*, 646 F.3d 549, 561 (8th Cir.2011). The hypothetical should capture the concrete consequences of the claimant's impairments. *Id.* "[A]n ALJ may omit alleged impairments from a hypothetical question posed to a [VE] when '[t]here is no medical evidence that those conditions impose any restrictions on [the claimant's] functional capabilities.'" *Owen v. Astrue*, 551 F.3d 792, 801–02 (8th Cir.2008) (quoting *Haynes v. Shalala*, 26 F.3d 812, 815 (8th Cir.1994)).

 The first hypothetical question included limitations as described by Newcomb during his testimony. With these limitations in mind, the VE stated an individual would not be able to return to any of Newcomb's past work or engage in any

other full-time job. AR 44–45. The second hypothetical was based on the state agency medical consultant's assessment and included limitations of simple repetitive tasks on a sustained basis and work that could be done independent of others. AR 45. For this hypothetical, the VE responded that these limitations were inconsistent with Newcomb's past work, but jobs as a polisher and inspector could be performed and were available in significant numbers in the regional and national economy. *Id.*

I find that the ALJ's second hypothetical question to the VE was proper and included the concrete consequences of Newcomb's impairments that were supported by substantial evidence in the record as a whole. Dr. Dupre's and Dr. Segreto's observations and opinions contain no specific limitations that could be included in a hypothetical, as Newcomb argues. Their observations and opinions are also inconsistent with substantial evidence in the record demonstrating that Adderall is effective in controlling Newcomb's symptoms. The ALJ did not err by basing his question on the state agency medical consultant's assessment, which primarily relied on Dr. Morton's evaluation and Newcomb's own description of his limitations. AR 280. Indeed, that assessment did not consider evidence of Newcomb's functional abilities while taking Adderall as prescribed and therefore may reflect more restrictive limitations than Newcomb has while he is on that medication. On reconsideration, Dr. Tedesco considered the medical evidence demonstrating that Adderall was effective. He noted that although the ADHD diagnosis was new, it had been considered historically and had likely been present in the past. He confirmed the state agency medical consultant's assessment as written.

The hypothetical question and RFC limitations of simple, repetitive tasks on a

sustained basis and work independent of others are supported by substantial evidence in the record. The instances of fidgety behavior did not need to be included in the hypothetical question to the VE. As explained earlier, substantial evidence in the record demonstrates this is not Newcomb's typical behavior when taking his medication as prescribed. The ALJ properly included all of Newcomb's credible limitations in the hypothetical question, and the VE's testimony therefore constitutes substantial evidence that Newcomb is able to perform other work that is available in the national economy.

### Conclusion

After a thorough review of the entire record and in accordance with the standard of review I must follow, I conclude that the ALJ's determination that Newcomb was not disabled within the meaning of the Act is supported by substantial evidence in the record. Accordingly, the decision of the ALJ is **affirmed** and judgment will be entered in favor of the Commissioner and against Newcomb.

**IT IS SO ORDERED.**

