# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1524

_____

| | |
|---|---|
| Brian Buckner, | * |
| | * |
| Appellant, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * Western District of Missouri. |
| Michael J. Astrue, Commissioner | * |
| of Social Security, | * |
| | * |
| Appellee. | * |

_____

Submitted: January 13, 2011
Filed: July 19, 2011

_____

Before WOLLMAN, LOKEN, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Brian Buckner appeals the district court's[1] judgment upholding the Commissioner of Social Security's ("Commissioner") denial of his application for disability insurance and supplemental security income (SSI) benefits, under Titles II and XVI of the Social Security Act (SSA). Buckner argues that the administrative law judge (ALJ) (1) erroneously determined that Buckner's mental impairments—specifically, his depression and anxiety—were not severe; (2)

_____

[1]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

inadequately evaluated the credibility of Buckner and Buckner's girlfriend; and (3) based his decision on an improperly phrased hypothetical question to the vocational expert (VE). For the following reasons, we affirm.

## I. *Background*

In Buckner's application for disability and SSI benefits, he alleged a disability beginning on August 29, 2005, at age 33. In his application, he stated that he could not work full time due to hypertension, sleep apnea, restless leg syndrome, headaches, anxiety, emotional problems, and gastroesophageal reflux disease (GERD). Buckner has a high school diploma but no further education. He previously worked as a warehouse worker, a milker on a dairy farm, a nursing assistant, and a taxi cab driver.

### A. *Medical History*

Buckner made several visits to different medical providers between April 2005 and October 2007. These visits were not directly related to his application for disability and SSI benefits, but they were included in the administrative record. The conditions documented by these providers are summarized below.

#### 1. *Hypertension*

Buckner began receiving medication for hypertension in April 2005. At that time, his blood pressure measured 199/121 and 180/101. He reported smoking 1.5 packs of cigarettes per day. On May 27, 2005, Buckner sought medical treatment and reported that he had not taken his hypertension medicine for two days, and he reported smoking two packs of cigarettes per day. His blood pressure measured 175/123, 154/108, and 160/105. He was instructed to take his hypertension medication.

With some exceptions, Buckner's hypertension generally improved over the course of 17 measurements in the next two years. Starting with a high of 180/132 in September 2005, Buckner's regular blood pressure readings steadily dropped, reaching

a low of 122/83 in October 2006. After that point, his blood pressure briefly spiked but ultimately returned to 150/90 in October 2007.

## 2. *Chest Pain*

At Buckner's May 2005 examination, a chest x-ray revealed "[q]uestionable mild cardiomegaly,"[2] which the doctor indicated "may be an artifact of the portable [x-ray] technique and the patient's body habitus."

Buckner reported a history of chest pain at his September 1, 2005 examination. An x-ray revealed "minimal old pulmonary granulomatous disease"[3] and a "borderline cardiac size." An electrocardiogram (EKG) revealed sinus bradycardia[4] but was otherwise normal.

On September 12, 2005, Buckner underwent a myocardial perfusion rest and stress test involving a "two-day treadmill exam." An EKG indicated a normal resting heart rate. With stress, Buckner had no chest pain. The examination revealed "[n]o evidence of myocardial scarring or of stress induced myocardial ischemia,"[5] "[m]ild inferior hypokinesis,"[6] and a normal "left ventricular ejection fraction" of 55 percent.

---

[2]Cardiomegaly is an "[e]nlargement of the heart." Stedman's Medical Dictionary 313 (28th ed. 2006).

[3]This disease is characterized by small or granular "nodular inflammatory lesions" in the lungs. *See id.* at 831–32.

[4]Bradycardia is a "[s]lowness of the heartbeat." *Id.* at 249.

[5]Myocardial ischemia involves "inadequate circulation of blood to the myocardium," the middle layer of the heart. *Id.* at 1001, 1271.

[6]Hypokinesis refers to "[d]iminished or slow movement." *Id.* at 934.

From September 2005 to October 2006, all of Buckner's cardiovascular examinations were normal. On October 10, 2007, Buckner went to the emergency room, complaining of intermittent chest pain. By the time he was examined, he reported no pain. Two days later, he had a normal cardiovascular examination.

### 3. *Other Physical Conditions*

Buckner suffered from a variety of other physical maladies, varying in their duration and severity. For example, Buckner's medical records with an advanced practice nurse indicated an ongoing problem with obesity and frequent complaints of headaches, nasal congestion, coughing, sneezing, restless leg syndrome, and tooth pain. Nevertheless, all of Buckner's visits to the advanced practice nurse revealed normal musculoskeletal, motor/sensory, strength, and sensation examinations.

The advanced practice nurse also diagnosed Buckner with GERD on May 27, 2005, for which she prescribed Zantac. In September 2005, Buckner reported that the Zantac helped "a lot," and in October 2006, he reported that his GERD was "great" while on Zantac.

On February 20, 2006, Buckner went to the emergency room, complaining of neck and back pain due to a motor-vehicle accident. An x-ray of his cervical spine revealed no fractures or subluxation[7] but could not exclude "[d]isc protrusion." An x-ray of his lumbar spine revealed "a questionable fracture" of the L2 vertebra, but the report stated it was "more likely . . . an artifact of overlapping soft tissues."

### 4. *Depression and Anxiety*

At an examination on September 1, 2005, Buckner reported having anger problems, and the advanced practice nurse diagnosed him with depression. He had normal psychological examinations on September 6 and 12, 2005. On September 15,

---

[7]A subluxation is "[a]n incomplete . . . dislocation." *Id.* at 1856.

2005, he returned to the advanced practice nurse and reported that his medication, Zoloft, was helping with his depression. The advanced practice nurse indicated that Buckner's psychological examination was normal.

On September 29, 2005, Buckner told the advanced practice nurse that the Zoloft was not helping with his depression. Nevertheless, the advanced practice nurse indicated that Buckner's psychological examination was normal. During visits in October, November, and December 2005 and March 2006, the advanced practice nurse documented normal psychological examinations. In April 2006, Buckner again reported to the advanced practice nurse that Zoloft was not helping, but Buckner's psychological examination was normal. The advanced practice nurse documented normal psychological examinations for Buckner in October and November 2006.

B. *Administrative History*
1. *Function Report*

On October 27, 2005, in connection with his August 29, 2005 application for disability and SSI benefits, Buckner completed a function report indicating how his mental and physical conditions limited his daily activities and abilities. He indicated that he could care for his son and girlfriend. He also stated that he could take care of his personal needs and grooming but would "sometimes" need reminders from his girlfriend for grooming and taking medication.

Buckner reported that he could clean and do "some yard work," although he noted that he would have to "sit down about every 10 minutes" because of chest pain. He stated that he went outside almost every day but usually could not drive because of his medication. He indicated that he could go shopping and manage his own money. He listed watching television, playing on the computer, and playing sports as hobbies, although he stated that he could not play sports "very often" because of pain in his legs (specifically, his restless leg syndrome). He also stated that he went to church on a regular basis.

In describing his abilities, Buckner claimed that his conditions affected his ability to lift, stand, climb stairs, see, remember, concentrate, and get along with others. He stated that he could walk 100 to 400 feet without resting but would require 20 to 30 minutes rest before resuming. He reported having panic attacks.

## 2. *Dr. Sutton's Psychological Report*

On January 18, 2006, Geoffrey Sutton, Ph.D., a licensed pyschologist, completed a "Psychiatric Review Technique" form. Dr. Sutton confirmed that Buckner's medical records showed that Buckner was suffering from depression and anxiety, concluding that "the allegations for mental disorders are partially credible." He concluded that Buckner's mental impairments did not impair Buckner's activities of daily living; mildly limited his ability to maintain social functioning; mildly limited his ability to maintain concentration, persistence, and pace; and did not result in any episodes of decompensation. Ultimately, Dr. Sutton concluded that Buckner's mental impairments were not severe.

## 3. *Disability Questionnaire*

Buckner completed a questionnaire on December 12, 2007, in which he stated that an ordinary day involves watching television, walking outside for a little while, and resting. He stated that he can stand no longer than 30 minutes at a time, walk short distances, lift light weights, and use his hands and arms. He also indicated that he can sit if he frequently changes positions. Finally, he reported being able to mow "small areas" of grass "with breaks" and to cook and wash dishes only if he needs to and "with breaks."

## 4. *Dr. Hwang's Physical Evaluation*

At the request of Buckner's attorney, Yung Hwang, M.D., examined Buckner on December 28, 2007. Dr. Hwang's report noted Buckner's history of hypertension, heart problems, restless leg syndrome, and headaches, which Dr. Hwang stated could be managed effectively with Buckner's prescribed medications. He noted that Buckner

had mild depression and anxiety not being treated with medication. He explained that Buckner "is mentally clear" and "has been evaluated for depression and anxiety but comprehends very well and understands with no difficulty and is capable of tending to his affairs with no assistance."

Dr. Hwang also noted Buckner's obesity and his lower back pain, and he reported that Buckner had full range of motion in his upper extremities (shoulders, elbows, wrists, hands, and fingers) and lower extremities (hips, ankles, and joints). Dr. Hwang indicated that Buckner had "full grip strength," could "walk 20 minutes before he becomes short of breath, stand[] 30 minutes without pain, lift 50 pounds occasionally[,] and sit for long periods."

Dr. Hwang reported the following limitations in a "Medical Source Statement (Physical)." He stated that Buckner could (1) lift objects weighing no more than 50 pounds; (2) stand or walk for four hours in an eight-hour day, up to 30 minutes at one time; and (3) sit with normal breaks for four hours in an eight-hour day, up to 30 minutes at one time. Dr. Hwang also reported mild limitations in Buckner's ability to (1) "push/pull" using his upper and lower extremities, (2) reach, and (3) handle. Dr. Hwang further stated that Buckner could never climb or be exposed to heights, temperature extremes, dust, fumes, or vibration. Finally, Dr. Hwang reported that, on average, Buckner's impairments would force him to be absent from work "[f]our plus times" each month.

### 5. *First Administrative Hearing*

The ALJ held Buckner's first administrative hearing on January 30, 2008. Nine days before the hearing, Buckner's girlfriend submitted a written statement stating that Buckner runs out of breath easily, is "always tired," and has no energy. She further stated that Buckner cannot work and cannot watch the children when she leaves the house.

Buckner testified at the hearing. He stated that he cannot work because of his hypertension. He described having two to three "bad days" each week, where he gets migraine headaches so intense that he isolates himself in his bedroom without any light. He claimed that he has panic attacks when he leaves the house and interacts with other people. He also stated that he has "throbbing" lower back pain if he sits or stands in one place for too long. He testified that he can play with the children for two to three hours at a time, "rolling on the floor a little bit maybe and walking with them just a short distance around the yard." He also said that he helps around the house and occasionally goes fishing.

### 6. *Dr. Corsolini's Physical Evaluation*

At the ALJ's request, Thomas B. Corsolini, M.D., evaluated Buckner on February 18, 2008. Dr. Corsolini reported that Buckner had full range of motion in his upper and lower extremities and in "all joints in the cervical spine." Buckner could "demonstrate a full squat independently" and had "excellent" balance and coordination. Dr. Corsolini concluded that Buckner's hypertension was "currently adequately treated," and Dr. Corsolini recommended no physical limitations.

### 7. *Second Administrative Hearing*

Buckner testified again at a second administrative hearing on July 21, 2008. He stated that he was no longer living with his girlfriend.

A VE also testified in response to hypothetical questions posed by the ALJ and Buckner's attorney. The ALJ asked the VE to consider "a hypothetical person of Mr. Buckner's age, education and work history" with the limitations described in Dr. Hwang's report, *except* for the limitations on reaching, handling, and being absent from work four times per month. The VE testified that a person with those limitations could perform "sedentary, unskilled work" as a credit card clerk or a final assembler, jobs which existed in significant numbers in the national economy. Buckner's attorney asked the VE to consider the same hypothetical person, *including* all of the limitations

noted in Dr. Hwang's report. The VE testified that such a person would not be able to find work.

## 8. *ALJ's Decision*

The ALJ issued a written decision denying Buckner's application for SSI and disability benefits, concluding that Buckner was "not disabled" within the meaning of the SSA. The ALJ found that Buckner had the following "severe" impairments: hypertension, morbid obesity, degenerative disc disease of the lumbar spine, and mild cardiomegaly.

The ALJ found that Buckner's depression was "not severe." In reaching this conclusion, the ALJ explained that "[b]ecause [Buckner's] medically determinable mental impairment causes no more than 'mild' limitation in any of the first three functional areas [activities of daily living; social functioning; and concentration, persistence, or pace] and 'no' limitation in the fourth area [episodes of decompensation of extended duration]," the depression was not severe under 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).

In assessing Buckner's residual functional capacity (RFC), the ALJ accepted all of Dr. Hwang's limitations, except for the limitations on handling, reaching, and being absent from work four times per month. The ALJ stated that Dr. Hwang did not explain his reasons for reaching these conclusions, and Dr. Hwang's own report—along with the other medical evidence of record—did not support, or even contradicted, Dr. Hwang's conclusions.

The ALJ expressly found that Buckner's statements about "the intensity, persistence and limiting effects of his symptoms are not credible to the extent they are inconsistent with the [RFC]." The ALJ based this credibility finding on several factors. First, Buckner's claims were inconsistent with the medical evidence and his own statements in the function report, the disability questionnaire, and at the

hearings—all of which indicated that Buckner "engage[d] in a range of daily activities inconsistent with" his claimed symptoms and limitations. The ALJ also noted that Buckner's hypertension was "not always controlled by medication," but Buckner "ha[d] apparently made no effort to improve his blood pressure reading by losing weight or eliminating tobacco use." Further, he had not reported any of the alleged symptoms of hypertension to his doctors. Finally, the ALJ noted that Buckner's sporadic work history prior to his alleged disability date "indicates that he was not strongly motivated to engage in productive activity," which weighed against his credibility.

Given these findings, the ALJ found that Buckner was unable to perform any of his past relevant work. Based on the VE's testimony, however, the ALJ concluded that Buckner could perform sedentary, unskilled work as a credit card clerk or a final assembler, jobs which exist in significant numbers in the national economy. Therefore, the ALJ found that Buckner was not disabled.

Buckner requested review of the ALJ's decision from the SSA's Appeals Council. On November 25, 2008, the Appeals Council denied Buckner's request, making the ALJ's decision the final decision of the Commissioner.

Buckner thereafter filed a complaint in the district court, seeking review of the Commissioner's final decision. The district court affirmed the Commissioner's decision, concluding that substantial evidence supported the determination that Buckner was not disabled.

## II. *Discussion*

We review de novo the district court's decision affirming the ALJ's denial of social security benefits. *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). In doing so, we will consider whether the ALJ's decision "is supported by substantial evidence on the record as a whole." *Id.* "Substantial evidence means less than a preponderance,

but sufficient evidence that a reasonable person would find adequate to support the decision." *Id.* "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) (internal quotations and citations omitted). "Rather, if, after reviewing the record, we find that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the decision of the Commissioner." *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) (internal quotations, alteration, and citations omitted).

### A. *Severity of Mental Impairments*

Buckner first contends that the ALJ's finding that his mental impairments—specifically, his depression and anxiety—were not severe was not supported by substantial evidence on the record as a whole. In particular, Buckner asserts that the ALJ ignored evidence of Buckner's treatment for depression, Buckner's complaints that the treatment was not effective, and Buckner's testimony that he sometimes isolated himself due to the depression. Moreover, Buckner notes that Dr. Sutton's psychological evaluation "concluded that [Buckner] would have mild difficulties maintaining social functioning and concentration, persistence, and pace." Because these symptoms have "more than a minimal impact" on Buckner's ability to do basic work activities, Buckner maintains that the ALJ was compelled to find that his mental impairments were severe.

We disagree and hold that substantial evidence on the record as a whole supports the ALJ's finding that Buckner's mental impairments were not severe. First, in determining whether a claimant's mental impairments are "severe," the regulations require the ALJ to consider "four broad functional areas in which [the ALJ] will rate the degree of [the claimant's] functional limitation: Activities of daily living; social

-11-

functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The regulations further provide:

> If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.

*Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Here, Dr. Sutton, a licensed psychologist, concluded in his report that Buckner's depression and anxiety did not impair his activities of daily living; mildly limited his ability to maintain social functioning; mildly limited his ability to maintain concentration, persistence, and pace; and did not result in any episodes of decompensation. As a result, the ALJ found that Buckner's depression and anxiety "causes no more than 'mild' limitation in any of the first 3 functional areas and 'no' limitation in the fourth area." Thus, pursuant to the regulations, the ALJ had substantial evidence supporting a conclusion that Buckner's depression and anxiety were "not severe."

Buckner does not challenge either Dr. Sutton's or the ALJ's findings in these four functional areas. Instead, he argues that, despite these findings, the evidence showed that his depression and anxiety had "more than a minimal impact" on his ability to do basic work activities. To the contrary, the evidence in the administrative record shows that Buckner's depression and anxiety resulted in very few limitations. Although Buckner did complain to the advanced practice nurse on two occasions in 2005 and 2006 that his medication was not helping with his depression, he had several normal psychological evaluations throughout this same time period. He also had several visits to the advanced practice nurse where he did not raise any concerns about his depression or the ineffectiveness of his medication. Likewise, Dr. Hwang noted that Buckner could effectively manage his depression and anxiety without medication or other assistance. While Buckner testified at the first administrative hearing that his

-12-

anxiety sometimes forced him to isolate himself in his bedroom, he also attributed those incidents to headaches caused by his hypertension. In any case, as discussed *infra*, the ALJ properly discounted Buckner's credibility regarding his claims of severe impairments. In sum, although Buckner was diagnosed with depression and anxiety, substantial evidence on the record supports the ALJ's finding that his depression and anxiety was not severe. *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990) ("Depression . . . is not necessarily disabling.").

## B. *Credibility Assessments*

Next, Buckner argues that the ALJ erred by not properly assessing his credibility and by not expressly addressing the credibility of his girlfriend's written statement. First, Buckner asserts that the ALJ improperly evaluated his credibility by (1) failing to "evaluate the dosage, effectiveness, and side effects of Buckner's prescription medications"; (2) improperly assessing Buckner's daily activities; and (3) "failing to consider that another agency found . . . Buckner disabled." Second, Buckner asserts that the ALJ must specifically discuss and express the credibility of any third-party statements regarding a claimant's condition. *Smith v. Heckler*, 735 F.2d 312, 317 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3). He maintains that the ALJ's failure to discuss his girlfriend's statement was "clear legal error" requiring a remand. *See Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008).

### 1. *Buckner*

This court has long required an ALJ to consider the following factors when evaluating a claimant's credibility:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.

-13-

*Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir.2008); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984)). ALJs "need not explicitly discuss each *Polaski* factor." *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005) (quotation and citation omitted). Although "an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them," the ALJ may find that these allegations are not credible "if there are inconsistencies in the evidence as a whole." *Id.* at 792 (internal quotations and citations omitted). We will defer to the ALJ's credibility finding if the ALJ "explicitly discredits a claimant's testimony and gives a good reason for doing so." *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010) (quotation and citation omitted).

Here, the ALJ expressly found that Buckner's "statements concerning the intensity, persistence and limiting effects of his symptoms" were not credible. Although the ALJ did not explicitly cite *Polaski*, he clearly considered the following factors: Buckner's daily activities, the effectiveness of his medication and other treatments, his work history, and the absence of objective medical evidence to support his complaints. Regarding Buckner's daily activities, the ALJ noted that in Buckner's disability questionnaire and his hearing testimony, Buckner stated that

> he was able to care for his son and his girlfriend (who was frequently ill), do house-cleaning, do some yard work, leave his residence nearly every day, ride in a car, go out alone, go shopping in stores, manage his finances, use a computer, play sports occasionally, socialize and play games with friends or family members and attend religious services.

The ALJ found these statements to be inconsistent with Buckner's claims of disabling pain. Next, regarding Buckner's medication and treatment, the ALJ stated that Buckner's "hypertension is not always controlled by medication, but [he] has apparently made no effort to improve his blood pressure reading by losing weight or eliminating tobacco use." Additionally, the ALJ found that Buckner's "sporadic" work

-14-

history prior to his alleged disability date "indicates that he was not strongly motivated to engage in meaningful productive activity even prior to the alleged onset of disability and weighs against his credibility in assigning reasons for not working." Finally, the ALJ found that Buckner's complaints were not supported by objective medical evidence. The ALJ noted that (1) Buckner's back problems were diagnosed as "mild" and did not warrant further testing or treatment; (2) his depression and headaches "never required regular psychiatric or psychological treatment[,] . . . and the record contains minimal documentation of complaints of headaches"; and (3) Dr. Hwang's examination report indicated that Buckner had full range of motion in all extremities, no sign of arthritis, full grip strength, and the ability to lift up to 50 pounds occasionally. The ALJ did not err by failing to discuss expressly some of the other factors, including any side effects from Buckner's medication. *See Moore*, 572 F.3d at 524. Our review of the ALJ's decision, in light of the entire administrative record, shows that there were inconsistencies between Buckner's allegations of pain and the evidence as a whole. *See Goff*, 421 F.3d at 792 (explaining that "[t]he ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole" (quotation and citation omitted)). As a result, the ALJ did not err in evaluating Buckner's credibility.[8]

## 2. *Buckner's Girlfriend*

The regulations also provide that the ALJ will "carefully consider any other information you may submit about your symptoms," including statements "other persons provide about your pain or other symptoms." 20 C.F.R. § 404.1529(c)(3). The regulation, however, does not define what is meant by "careful consideration." When

---

[8]The ALJ also did not err by failing to address the fact that Buckner may have received Medicaid benefits at one time because this evidence, standing alone, does not indicate whether another agency found Buckner disabled. *See* 20 C.F.R. § 404.1512(b)(5); Mo. Rev. Stat. § 208.151 (listing the types of individuals eligible for Missouri Medicaid benefits).

considering the issue, this court has not always insisted that the ALJ explicitly explain its reasons for discrediting a third-party's statements about the claimant's condition.

In *Robinson v. Sullivan*, the ALJ explicitly discredited testimony from the claimant's wife but failed to discuss the reasons for doing so. 956 F.2d 836, 841 (8th Cir. 1992). We noted that "it is clear that the ALJ specifically addressed [the wife's] testimony and found it not credible" and that "[t]his finding is supported by the same evidence that proved [the claimant's] claims not credible." *Id.* Ultimately, we affirmed the ALJ, explaining that "[w]hile it is preferable that the ALJ delineate the specific credibility determinations for each witness, an arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome." *Id.* (quotation and citation omitted).

Three years later, in *Lorenzen v. Chater*, we again considered an argument that the ALJ erred by "fail[ing] to list specific reasons for discrediting the testimony" of a third party. 71 F.3d 316, 319 (8th Cir. 1995). Nonetheless, we affirmed the ALJ because "it is evident that most of [the third party's] testimony concerning [the claimant's] capabilities was discredited by the same evidence that discredits [the claimant's] own testimony concerning his limitations." *Id.*

Finally, in *Willcockson*, we considered an ALJ's failure to consider statements submitted by the claimant's mother, daughter, and sister. 540 F.3d at 880. We noted that we could not "determine from the record whether the ALJ overlooked these statements, gave them some weight, or completely disregarded them." *Id.* Moreover, we "question[ed] whether witness statements corroborating a claimant's subjective complaints can logically be treated as cumulative by assuming that they would have been rejected for the same reasons that the claimant statements were rejected." *Id.* at 881. This failure to address the third-party statements—combined with the ALJ's failure to explain the weight given to a nonexamining consultant's report and his

insufficient assessment of the claimant's own statements—compelled us to remand the case. *Id.* at 880–81.

In the present case, although the ALJ did not expressly address the girlfriend's statement in his decision, the ALJ's error does not require remand. Unlike the statements in *Robinson*, the ALJ did not explicitly address the claims that Buckner's girlfriend made about Buckner's conditions. Rather, as in *Willcockson*, we cannot determine from the record whether the ALJ considered her statements at all. At the same time, much like the third-party statements *Robinson* and *Lorenzan*, the same evidence that the ALJ referred to in discrediting Buckner's claims also discredits the girlfriend's claims. Specifically, Buckner's girlfriend stated that Buckner cannot watch the children when she leaves the house. As noted above, the ALJ observed that Buckner, in his disability questionnaire and his hearing testimony, "stated that he was able to care for his son." Buckner's girlfriend also claimed that Buckner could not work, would run out of breath easily, and had no energy. Although the ALJ did not address all of these specific claims, the ALJ did find that Buckner's own statements and hearing testimony "show that he engages in a range of daily activities inconsistent with his allegation of disabling hypertension, headaches, back pain, hand cramps, shortness [of] breath, chest pains, depression and anxiety." Finally, the decision here did not suffer from the other deficiencies noted in *Willcockson*; most notably, as discussed *supra*, the ALJ here did sufficiently assess Buckner's credibility. Thus, we hold that the ALJ's "arguable deficiency in opinion-writing technique," *Robinson*, 956 F.2d at 841 (quotation and citation omitted), had no bearing on the outcome of Buckner's case and does not require remand.

C. *Hypothetical Questions to VE*

Finally, Buckner argues that the ALJ's finding that Buckner could find employment as a credit card clerk or a final assembler was not supported by substantial evidence because it was based on a VE's response to an improperly phrased hypothetical question. Buckner contends that the ALJ's hypothetical question to the

VE must include all credible, relevant impairments in order for the VE's response to qualify as "substantial evidence." *See Hunt v. Massanari*, 250 F.3d 622, 626 (8th Cir. 2001). In Buckner's case, the ALJ "found that Buckner had mild deficiencies in maintaining activities of daily living social functioning, and concentration, persistence, or pace." Despite this fact, the ALJ failed to include these deficiencies in the hypothetical question to the VE. Moreover, Buckner argues the ALJ failed to include "the impact of drowsiness as a side effect of Buckner's medications." Thus, he argues that the VE's testimony cannot provide substantial evidence for the ALJ's determination that Buckner was not disabled.

The Commissioner responds that the ALJ's hypothetical question to the VE properly included all of Buckner's "credible limitations." First, the Commissioner contends that because Buckner's mental impairments were "not severe," the ALJ was entitled to exclude "any limitation flowing from depression" in the hypothetical question to the VE. Likewise, the Commissioner asserts that the record did not support Buckner's claims of drowsiness as a side effect of his medication and that the ALJ properly excluded it as a possible impairment in the hypothetical question. Because the ALJ's hypothetical question to the VE properly incorporated all credible limitations, the Commissioner concludes that the VE's testimony provided substantial evidence supporting the ALJ's determination that Buckner was not disabled.

"A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments." *Hulsey*, 622 F.3d at 922. But "[w]hen a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence. Thus, the ALJ's hypothetical question must include those impairments that the ALJ finds are substantially supported by the record as a whole." *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996) (internal citation omitted). At the same time, we have recognized that "[t]he hypothetical need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the

concrete consequences of those impairments." *Hulsey*, 622 F.3d at 922 (quotation and citation omitted).

For example, we have held that "an ALJ may omit alleged impairments from a hypothetical question posed to a vocational expert when '[t]here is no medical evidence that these conditions impose any restrictions on [the claimant's] functional capabilities'" or "when the record does not support the claimant's contention that his impairments 'significantly restricted his ability to perform gainful employment.'" *Owen v. Astrue*, 551 F.3d 792, 801–02 (8th Cir. 2008) (quoting *Haynes v. Shalala*, 26 F.3d 812, 815 (8th Cir. 1994); *Eurom v. Chater*, 56 F.3d 68 (8th Cir. 1995) (per curiam) (unpublished table opinion)). On at least one occasion, we have held that the ALJ did not err by excluding the claimant's mental limitations from the hypothetical questions to the VE, when substantial evidence supported the ALJ's determination that the claimant's mental limitations were "nonsevere." *Jackson v. Apfel*, 162 F.3d 533, 538 (8th Cir. 1998).

Here, the ALJ did not explicitly mention Buckner's depression and anxiety in the hypothetical to the VE. On this record the ALJ did not err. The ALJ did not entirely discount the credibility of Buckner's claims of depression and anxiety. However, the ALJ, as explained above, reasonably concluded with substantial evidence that these impairments were "not severe." This is consistent with our precedent. *See Jackson*, 162 F.3d at 538. The ALJ's hypothetical asked the VE to consider the restrictions noted in Dr. Hwang's report, excluding only Dr. Hwang's restrictions on reaching, handling, and being absent from work.[9] Dr. Hwang's report did note that Buckner had been diagnosed with depression. Because Dr. Hwang's Medical Source Statement incorporated *all* of Buckner's impairments—including Buckner's depression and anxiety—into Dr. Hwang's recommended limitations, we

---

[9]The ALJ excluded them from the hypothetical because he found that they were not credible, and Buckner has not challenged the exclusion of these restrictions from the ALJ's hypothetical to the VE.

can safely conclude that the ALJ's hypothetical "capture[d] all of the concrete *consequences* of those [credible] impairments." *Hulsey*, 622 F.3d at 922 (emphasis added). As such, the VE's answer to that hypothetical constitutes substantial evidence supporting the ALJ's determination that Buckner was not disabled.

### III. *Conclusion*

For the foregoing reasons, we hold that substantial evidence on the record as a whole supports the ALJ's decision. We therefore affirm the judgment of the district court.

_____